# United States Tax Court

T.C. Memo. 2025-61

INGA I. KRAMARENKO,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 9192-14.                                     Filed June 9, 2025.

————

P worked full time as a "post-doc"—a trained Ph.D. with high technical skills—in laboratories at a university's medical institution. In that capacity P performed work in the laboratory. In return P received further training in laboratory techniques at the direction of her scientist supervisors and received a salary and various other benefits incidental to employment.

P contends that her salary was in the nature of a "grant" and was therefore exempt from taxation pursuant to Article 18 of the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital, Russ.-U.S., June 17, 1992, T.I.A.S. No. 93-1216 (U.S.-Russia Tax Treaty). On her income tax returns for 2010 and 2011 she reported the salary as tax exempt. R determined that the salary was payment for her work and was therefore ineligible for the Article 18 exemption, and R determined accuracy-related penalties under I.R.C. § 6662(a) and (b)(2).

*Held*: Under *Baturin v. Commissioner*, 31 F.4th 170 (4th Cir. 2022), *rev'g and remanding* 153 T.C. 231 (2019), P's salary was earned through an employer-employee relationship as part of a substantial "quid pro quo" for her labor, not as a "grant, allowance, or other similar

**Served 06/09/25**

**[*2]**  payment[]" under the U.S.-Russia Tax Treaty, and is therefore not exempt from U.S. income tax.

*Held, further*, P is liable for the accuracy-related penalties under I.R.C. § 6662(a) and (b)(2) on the underpayments resulting from reporting that income as tax exempt.

––––––––––

*Frederik W. Pfeil* and *Mark P. Fessler*, for petitioner.

*Ashley M. Bender*, *Halvor R. Melom*, and *Olivia H. Rembach*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, *Judge*: Pursuant to section 6212,[1] the Internal Revenue Service ("IRS") issued a statutory Notice of Deficiency ("NOD") to petitioner, Inga I. Kramarenko, on January 24, 2014, determining deficiencies in federal income tax in the amounts of $5,688 for 2010 and $5,919 for 2011, and determining accuracy-related penalties under section 6662(a) and (b)(2) in the amounts of $1,138 for 2010 and $1,184 for 2011.

Dr. Kramarenko filed in the Tax Court a timely Petition under section 6213(a) for redetermination of the deficiencies. She concedes the preliminary issue that she was a resident alien in 2010 and 2011 (the years at issue).[2] There are two remaining issues for decision: (1) whether the salary that Dr. Kramarenko received from the Medical University of

––––––––––

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code ("the Code", Title 26 of the United States Code) as in effect at the relevant times; references to regulations are to Title 26 of the *Code of Federal Regulations* ("Treas. Reg.") as in effect at the relevant times, and references to Rules are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[2] Respondent concedes that, even as a resident alien, Dr. Kramarenko may be exempt from federal income tax if she satisfies Article 18 of the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, Russ.-U.S. ("Treaty"), June 17, 1992, T.I.A.S. No. 93-1216. The parties agree that Dr. Kramarenko was a Russian resident at the beginning of her stay in the United States and that she became a U.S. resident (by virtue of the "substantial presence test" of section 7701(b)(3)) sometime before the years at issue.

[*3] South Carolina ("MUSC") for her work during the years at issue is exempt from federal income tax under Treaty Article 18[3] and, if not, (2) whether or to what extent she is liable for the accuracy-related penalties that the IRS determined against her.[4]

## FINDINGS OF FACT

The facts below are based on the pleadings and the parties' Stipulations of Fact (including the exhibits attached thereto) and the testimony and additional exhibits admitted at trial. When she timely mailed her Petition, Dr. Kramarenko resided in South Carolina.[5]

Dr. Kramarenko is originally from Russia, where she studied and received in 2001 her M.S. in Medical Biophysics and in 2006 her Ph.D. in Biophysics. Dr. Kramarenko began looking for a postdoctoral ("post-doc") fellowship position immediately after receiving her Ph.D.

*MUSC hiring and onboarding*

In mid-2006, i.e., before the years at issue, Dr. Kramarenko applied for and was hired for a post-doc fellowship position at MUSC's Department of Medicine in its Division of Nephrology. She received a J–1 visa as an "Exchange Visitor,"[6] effective from September 2006 to

---

[3] The Treaty was suspended effective August 16, 2024. *See* Announcement 2024-26, 2024-27 I.R.B. 14.

[4] Dr. Kramarenko concedes that she is liable for the accuracy-related penalty with respect to "underpayments based on income received from September 8, 2011, through December 31, 2011." Dr. Kramarenko does not dispute that the accuracy-related penalties at issue were timely and properly approved in writing in compliance with section 6751(b).

[5] Absent stipulation otherwise, venue for an appeal in this case would be the U.S. Court of Appeals for the Fourth Circuit, *see* § 7482(b)(1)(A), which is the court that decided *Baturin v. Commissioner*, 31 F.4th 170 (4th Cir. 2022), *rev'g and remanding* 153 T.C. 231 (2019).

[6] The designations for the pertinent varieties of nonimmigrant visas are derived from the respective subparagraphs, clauses, and subclauses of subsection (a)(15) (defining "immigrant" as "every alien" and listing the exceptions) in section 101 ("Definitions") of the Immigration and Nationality Act, ch. 477, 66 Stat. 163, 167 (1952) (codified as amended at 8 U.S.C. §§ 1101–1537). Thus, a "J–1 visa" is issued pursuant to 8 U.S.C. § 1101(a)(15)(J) (providing a J–1 visa to "an alien having a residence in a foreign country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill, . . . who is coming temporarily to the United States").

[*4] July 2008, to enable her to travel to the United States for the position. (She later renewed her J–1 visa in August 2008, extending its period of validity through June 2010.)

Dr. Kramarenko moved to South Carolina in September 2006 and had her orientation at MUSC that month. Sometime thereafter she became a resident alien of the United States. As part of her onboarding at MUSC, Dr. Kramarenko filled out forms making elections about her insurance and retirement benefits as well as income-tax-related paperwork, including IRS Forms W–4, "Employee's Withholding Allowance Certificate," and W–8BEN, "Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding," an "Election of Non-Membership in the South Carolina State Retirement Systems," an "Employee Citizenship Identification," a Form I–9, "Employment Eligibility Verification," a "Position/Employee Action Request Form," and an "Insurance Program Active Notice of Election" from the South Carolina State Budget and Control Board. Dr. Kramarenko did not indicate on Form W–8BEN or elsewhere that she claimed any tax treaty benefits.

In September 2006 Dr. Kramarenko also signed an "Assignment Information Sheet" which "notified [Dr. Kramarenko] of the terms of employment", which included (among other things) her position, monthly salary, date and method of payment, deductions from pay, leave benefits, insurance benefits, and retirement benefits for purposes of S.C. Code Ann. § 41-10-30(A) (1990) ("Notification to employees of wages and hours agreed upon; recordkeeping requirements; requirement of itemized statement of gross pay and deductions for each pay period").[7] Dr. Kramarenko signed the Assignment Information Sheet as

---

*See* 22 C.F.R. §§ 41.12 tbl.1 ("J1 . . . Exchange Visitor"), 62.1(a), 62.2 (defining "J visa") (2023). An "H1B visa" is issued pursuant to 8 U.S.C. § 1101(a)(15)(H) (providing an H1B visa to "(H) an alien (i) . . . (b) subject to section 1182(j)(2) of this title, who is coming temporarily to the United States to perform services"). *See* 22 C.F.R. § 41.12 tbl.1 ("H1B . . . Temporary Worker in a Specialty Occupation").

[7] S.C. Code Ann. § 41-10-30(A) provides in part: "Every employer shall notify each employee in writing at the time of hiring of the normal hours and wages agreed upon, the time and place of payment, and the deductions which will be made from the wages, including payments to insurance programs."

[*5] "Employee," but it is unclear from the record who signed on behalf of her "Employer."[8]

In September 2006 a Form I–9 was signed on behalf of MUSC in the space marked "Signature of Employer or Authorized Representative." Dr. Kramarenko signed additional Forms I–9 in February 2007, June 2010, and September 2011 in the "Employee's Signature" space.[9]

*Dr. Garnovskaya's laboratory and grant: 2006–08*

After her arrival in 2006, Dr. Kramarenko initially worked in Dr. Maria Garnovskaya's laboratory, where she learned laboratory techniques. While there, Dr. Kramarenko worked with living cells, treating the cells with certain drugs and then measuring the results.

Before Dr. Kramarenko began working in Dr. Garnovskaya's laboratory, Dr. Garnovskaya had applied for and received a research grant from the American Heart Association that funded research for her laboratory at MUSC for a term of two years. Dr. Kramarenko's work in Dr. Garnovskaya's laboratory preceded the years at issue, so we do not address it further.

*Dr. Cunningham's laboratory and grant: 2008–10*

In August 2008 Dr. Kramarenko transferred to work in a different post-doc fellowship position and department at MUSC, this time in Dr. Lisa L. Cunningham's laboratory, to continue studying signal transduction in highly specialized cells. Until Dr. Cunningham hired Dr. Kramarenko, the position had been filled by graduate students.

For the time that Dr. Kramarenko worked in Dr. Cunningham's laboratory (including 2010, the first of the two years at issue), Dr. Cunningham was solely responsible for applying for extramural grants to secure the majority of the funding for her own salary and her laboratory. If Dr. Cunningham had not obtained grants to fund her laboratory, then her laboratory would have been closed.

---

[8] On August 6, 2008, upon transferring to a different post-doc fellowship position in a different department at MUSC, Dr. Kramarenko signed a second Assignment Information Sheet.

[9] The Form I–9 signed by Dr. Kramarenko in 2007 was also signed on behalf of MUSC in the space marked "Signature of Employer or Authorized Representative."

**[\*6]** Dr. Cunningham applied for and received a Research Project grant (an "R01 grant") from the National Institutes of Health ("NIH")[10] that funded research for her laboratory at MUSC from 2006 through December 2010. The R01 grant is an award made to support a discrete, specified, circumscribed project to be performed by the named investigator(s) in an area representing the investigator's specific interest and competencies, based on the mission of the NIH.

The money from the grant was sent from the NIH to MUSC in quarterly or yearly disbursements and was deposited into an account specifically earmarked for Dr. Cunningham's research project; MUSC was not free to use that grant money for any other purpose. The cost of materials that Dr. Cunningham ordered for her laboratory was paid by MUSC using the funds in the account set aside for her laboratory.

In connection with her transfer to Dr. Cunningham's laboratory in 2008, Dr. Kramarenko signed a second Assignment Information Sheet. Like the previous Assignment Information Sheet, this document set forth the "terms of [her] employment", including position, salary, leave benefits, insurance benefits, and retirement benefits. Dr. Kramarenko's annual salary increased to $41,796, which was funded by the grant from the NIH. Dr. Kramarenko renewed her J–1 visa again in June 2010, extending its period of validity through 2011.

During the period of Dr. Kramarenko's post-doc fellowship, she received support from principal researchers to enhance her research skills and to train her as a scientist who herself could become a principal researcher in the future. When Dr. Kramarenko initially joined Dr. Cunningham's laboratory, Dr. Cunningham supervised her more closely while she learned new techniques; but once Dr. Kramarenko's skills had developed, she and Dr. Cunningham would discuss what the experiment was going to be, then Dr. Kramarenko could run the experiment independently. Once she had acclimated to the laboratory, Dr. Kramarenko displayed excellent technical skills and did not require supervision for carrying out the assigned experiments. After Dr. Kramarenko carried out an experiment independently, she and Dr. Cunningham would discuss the results and the next experiment. Occasionally, Dr. Kramarenko traveled to attend conferences at which

---

[10] According to the NIH, the R01 grant is a mechanism for supporting novel scientific ideas or new model systems, tools, or technologies that have the potential to significantly advance knowledge or the status of health-related research.

[*7] she presented findings that the laboratory had reached to date.[11] She also co-authored multiple published papers about the research she and the scientists she worked for performed. Additionally, Dr. Kramarenko was able to place orders for materials for the MUSC laboratories in which she worked, but only with the approval of the principal investigators for whom she worked. Dr. Kramarenko worked 40 to 70 hours per week in Dr. Cunningham's laboratory.

Dr. Cunningham applied for a renewal of her R01 grant in July 2009. She resubmitted that grant renewal application in November 2009. In February 2010 (i.e., just after the beginning of the first year at issue) she also submitted an application to the NIH for a new grant. Dr. Cunningham did not list Dr. Kramarenko as a senior or key person in any of those applications and did not attach to any of those applications a "biosketch" of Dr. Kramarenko, which is normally required for all senior or key personnel in the grant application.

Dr. Kramarenko continued to work in Dr. Cunningham's laboratory through 2010. Dr. Cunningham's R01 grant terminated on December 31, 2010, when Dr. Cunningham left MUSC and joined the NIH to continue her research there. MUSC was not entitled to the remainder of the funds from the R01 grant after Dr. Cunningham left MUSC.

*Dr. Krupenko's laboratory and grant: 2011*

In January 2011 Dr. Kramarenko transferred to a new position in the Division of Basic Sciences at MUSC with the laboratory of Dr. Natalia Krupenko, where Dr. Kramarenko worked for the rest of that year (and continuing into 2012, a year not at issue here), performing biochemistry and molecular biology experiments. At trial Dr. Kramarenko noted that she did not really want to work in Dr. Krupenko's laboratory, but it was her only choice. Dr. Kramarenko did not work in any laboratory other than Dr. Krupenko's laboratory during 2011.

Dr. Kramarenko's position in Dr. Krupenko's laboratory was funded by a grant that Dr. Krupenko received from the NIH (grant No. R21DK083744, entitled "Nuclear Function of Glycine N-methyltransferase"). The parties have stipulated that "[i]n all

---

[11] For example, Dr. Kramarenko traveled to Boston to present an abstract at a meeting regarding the molecular biology of hearing and deafness.

[*8] material respects, including (among other things) grants, funding, and working conditions, Dr. Krupenko's laboratory in 2011 was substantially the same as Dr. Cunningham's laboratory in 2010."

The paperwork having to do with Dr. Kramarenko's transfer from Dr. Cunningham's laboratory to Dr. Krupenko's laboratory consistently described her as an employee. Internal emails at MUSC between January 10 and 18, 2011, discussed Dr. Kramarenko's compensation as "salary." In December 2010 Dr. Kramarenko signed a third Assignment Information Sheet. Like the previous two Assignment Information Sheets, this document set forth and "notified [Dr. Kramarenko] of the terms of employment," including position, salary (which increased to $43,000 per year), leave benefits, insurance benefits, and retirement benefits. The Assignment Information Sheet consistently described Dr. Kramarenko as an "employee", and it was signed by Dr. Kramarenko as "Employee" and with an illegible signature for her "Employer."

She renewed her J–1 visa again in May 2011, extending its period of validity through September 2011. In September 2011 she received an H1B visa as a "Temporary Worker in a Specialty Occupation", *see supra* note 6, that was valid through September 2014.

*Petitioner's personal life in the United States*

While in the United States, Dr. Kramarenko met an American citizen whom she married in 2008. They have continuously resided at the same address in South Carolina from their marriage in 2008 at least until the date the Petition was filed in April 2014. Dr. Kramarenko gave birth to twins in May 2012, after which she took a leave of absence from MUSC. She became a permanent resident of the United States in October 2012. She did not return to work at MUSC, and her employment there was terminated in December 2012.

*Tax returns, NOD, and Petition*

For taxable years 2010 and 2011, Dr. Kramarenko filed Form 1040NR–EZ, "U.S. Income Tax Return for Certain Nonresident Aliens With No Dependents." Dr. Kramarenko misrepresented on her 2010 and 2011 tax returns that she was a single nonresident alien when in fact she was married and was a resident alien in both years. Dr. Kramarenko reported on her returns that her tax home was Russia, that she had a closer connection to Russia than to the United States, and that all of her income for tax years 2010 and 2011 was exempt from taxation under the Treaty.

**[*9]** The IRS examined those returns and sent Dr. Kramarenko an NOD on January 24, 2014, determining that she had received income of $41,681 in 2010 and $42,885 in 2011, which (the IRS determined) was not exempt from federal income taxation. The NOD determined the resulting tax liabilities and the corresponding penalties under section 6662(a) and (b)(2).

In response to the NOD, Dr. Kramarenko filed her Tax Court Petition, asserting that her income from MUSC was exempt from federal income taxation pursuant to Treaty Article 18.

## OPINION

I. *Basic legal principles*

A. *Burden of proof*

A taxpayer generally bears the burden of proof when contesting the determinations in an NOD. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). There is no dispute as to whether Dr. Kramarenko received the salary from MUSC, and she does not argue that the burden of proof has shifted pursuant to section 7491(a) or that, for any other reason, she does not bear the burden of proof.

B. *Governing statutory framework*

The Code "imposes an income tax on the income of every individual who is a citizen or resident of the United States." *See* Treas. Reg. § 1.1-1(a). Thus, "all resident alien individuals are liable to the income taxes imposed by the Code." *Id.* para. (b).

Dr. Kramarenko has stipulated that in the years at issue she was a resident alien, so, like other individual taxpayers, she was required to include compensation for services, such as wages, in her gross income. *See* § 61(a). However, she invokes the Treaty, which could affect an individual's liability.

C. *The Treaty*

The interpretation of treaty provisions begins with the wording of the treaty. *N.W. Life Assurance Co. of Can. v. Commissioner*, 107 T.C. 363, 378–79 (1996). The role of the judiciary in interpreting treaty provisions is to give effect to their underlying intent or purpose. *Estate of Silver v. Commissioner*, 120 T.C. 430, 434 (2003). Generally, the

**[\*10]** Treaty permits the host country to tax "salaries, wages, and other similar remuneration derived . . . in respect of an employment" under Article 14. Article 14(1) of the Treaty provides:

> Subject to the provisions of Articles 15 (Directors' Fees), 16 (Government Service), and 17 (Pensions), salaries, wages, and other similar remuneration derived by a resident[12] of a Contracting State [here, the United States] in respect of an employment shall be taxable only in that State unless the employment is exercised in the other Contracting State [in Russia]. If the employment is so exercised, such remuneration as is derived therefrom may be taxed in that other State.

If the Treaty said no more, then Article 14(1), would govern this case: Dr. Kramarenko was a resident of the United States, and her "employment" was "exercised" in the United States, so that the "remuneration . . . derived therefrom may be taxed in" the United States. However, Dr. Kramarenko points to Article 18, "Students, Trainees and Researchers", which provides as follows:

> 1. An individual who is a resident of a Contracting State [here, Russia[13]] at the beginning of his visit to the other Contracting State [here, the United States] and who is temporarily[14] present in that other State [the United States] for the primary purpose of:
>> a) studying at a university or other accredited educational institution in that other State [the United States], or

---

[12] As we have noted, Dr. Kramarenko was a resident alien of the United States during the years at issue.

[13] As we have noted, Dr. Kramarenko was a Russian resident at the beginning of her stay in the United States, so Article 18(1) applies to her, even though she was a resident alien in the United States by the time of the years at issue.

[14] Dr. Kramarenko contends that her presence in the United States from 2006 to 2011 was temporary both as a matter of her subjective intent and by virtue of the inherently temporary nature of her J–1 visa and her H1B visa (both of which are non-immigrant visas issued to "an alien . . . who is coming temporarily to the United States", *see* 8 U.S.C. § 1101(a)(15)(J), (H)(i)(b), in contrast with her receiving "permanent" residence under a green card in October 2012). Because we hold that the payments she received were not grants (and are therefore not exempt under the Treaty for someone in her situation), we need not reach the "temporarily present" requirement of Article 18(1).

[*11]      b) securing training required to qualify him to practice a profession or professional specialty, or

c) studying or doing research as a recipient of a grant, allowance, or other similar payments from a governmental, religious, charitable, scientific, literary, or educational organization,

shall be exempt from tax by that other State [the United States] [1] with respect to payments from abroad [i.e., from outside the United States] for the purpose of his maintenance, education, study, research, or training, and [2] with respect to the grant, allowance, or other similar payments.

*Id.* art. 18(1). The terms of section 1 thus provide two conditions that an individual must meet in order to benefit from this exemption: First, the individual must have been present in the United States for a qualifying "purpose" (i.e., "studying", *id.* sec. 1(a); "securing training", *id.* sec. 1(b); or "doing research" as a recipient of certain kinds of payments, *id.* sec. 1(c)). Second, the payments she received must have been either "from abroad" or "with respect to" those kinds of payments.

As to the purpose of Dr. Kramarenko's presence in the United States, she was not "studying," *cf. id.* sec. 1(a), but her work can be characterized as having been either "securing training," *cf. id.* sec. 1(b), or "doing research," *cf. id.* sec. 1(c), and since either of these purposes could qualify under section 1, we need not determine which one might have predominated. It is true that "doing research" in section 1(c) is modified by the phrase "as a recipient of a grant, allowance, or other similar payments" whereas "securing training" in section 1(b) is not. From that absence in section 1(b), Dr. Kramarenko seems to argue that one who "secures training" need not prove that the payments she received constituted a "grant," etc., in order to get the income exemption of Article 18(1). However, the operative "grant," etc., limitation appears in the flush text of section 1 (beginning with "shall be exempt"), which provides that the only sort of payment that can be exempt under section 1 is a "grant," etc. Consequently, we do not need to decide whether Dr. Kramarenko's activity was "securing training" under section 1(b) or "doing research" under section 1(c). In either event the payments she received from that activity will be exempt from U.S. income tax only if they constitute "a grant, allowance, or other similar payments."

**[\*12]** As to the nature of the payments that Dr. Kramarenko received, she did not receive them "from abroad" (from Russia), so the decisive remaining question is whether the payments are properly characterized as a "grant, allowance, or other similar payments."

II.   *The parties' contentions*

Dr. Kramarenko contends that the payments she received from MUSC are exempt from U.S. taxation under Treaty Article 18, as payments made "with respect to the grant, allowance, or other similar payments." Respondent contends that because the payments in issue are wages, they cannot be "grant[s], allowance[s], or other similar payments" and are by definition excluded from the Article 18 exemption.

III.   *Analysis*

Respondent contends that the subject payments Dr. Kramarenko received from MUSC did not constitute a "grant, allowance, or award" within the meaning of Article 18 because Article 18 does not apply to income in respect of employment, which is generally covered by Article 14.   Respondent argues that the subject payments to Dr. Kramarenko instead constituted compensation from employment—that is, salary—that is taxable by the United States pursuant to Article 14 and the legal principles discussed above in Part I.B.  We now undertake to analyze the distinction between salary and grants.  In making that analysis, we rely principally on the evidence presented as to 2010 (when Dr. Kramarenko worked in Dr. Cunningham's laboratory), since the parties presented more such evidence than they presented as to 2011 (when she worked in Dr. Krupenko's laboratory). This reliance is appropriate, since, as we noted, the parties stipulated that "[i]n all material respects, including (among other things) grants, funding, and working conditions, Dr. Krupenko's laboratory in 2011 was substantially the same as Dr. Cunningham's laboratory in 2010."

   A.   *Non-dispositive considerations*

We mention briefly two considerations that do not govern our decision.  First, although it is true that the available documentation consistently refers to Dr. Kramarenko's payments as "salary" (and not as "grants" or a similar term), we do not rely on this labeling as necessarily binding.  The consistent use of "salary" is some evidence that the amounts were indeed salary rather than grants; but it is true that salary that is labeled a "grant" is still salary, and that a grant that is labeled "salary" is still a grant.  Therefore, we go beyond the terminology

**[\*13]** and also consider the nature of the payments to determine what they are.

Second, the outcome is not governed by the fact that Dr. Kramarenko's payments were made to her by MUSC out of funds that had been paid by the NIH to MUSC as "grants" for the university's research. Professional staff, clerical staff, and even janitorial staff at a research university might be paid out of funds that the university had received as grants from the NIH, but this hardly means that each member of the staff can be said to have received (in the words of section 1(c)) "a grant . . . from a governmental, . . . scientific, . . . or educational organization." It was MUSC that received the NIH grant; the workers that it hired received their salaries from MUSC. If a payment from MUSC can be characterized as a "grant", then that will be because the payee received a grant *from MUSC*, not because MUSC had received a grant from the NIH.

B.    *Guidance in the Treaty*

The Treaty does not define what differentiates "salaries, wages, and other similar remuneration" addressed under Article 14 from the "grant[s], allowance[s], [and] other similar payments" that are exempt under Article 18. *Baturin v. Commissioner*, 31 F.4th at 174. However, as the Fourth Circuit observed in *Baturin*, the Treaty does establish that "these categories are mutually exclusive, given the simple fact that one is taxable and the other is not." *Id.* at 173. The legislative history of the Treaty's ratification confirms this interpretation. *Id.* ("It is not the policy of . . . either [the United States or Russia] to provide special exemptions of the compensation earned by . . . researchers . . . ." (quoting S. Hrg. 103-335, *Tax Conventions With:* [Various], *Hearing Before the Sen. Foreign Relations Comm.*, 103rd Cong. 26 (1993) (statement of Leslie B. Samuels, Assistant Secretary for Tax Policy, Treasury Department))). "Grants may be dispersed *periodically*, but for purposes of the Treaty, a grant paid as a salary is an oxymoron. The two are dichotomous and mutually exclusive. Either payments are Article 14 wages, salaries, or similar remuneration (and thus taxable); or they are Article 18 grants, allowances, or other similar payments (and thus tax-exempt). They cannot be both." *Id.*

Beyond establishing mutual exclusivity, the Treaty is not particularly helpful in defining what distinguishes salaries from grants. But Article 3(2) of the Treaty does give this guidance:

**[\*14]** As regards the application of the Convention by a Contracting State, any term not defined therein shall, unless the context otherwise requires or the competent authorities agree to a common meaning . . . , have the meaning which it has *under the laws of that State concerning the taxes to which this Convention applies.*

(Emphasis added.) We next look, then, to U.S. law.

C.      *U.S. tax law principles*

In looking to the law of the United States to inform our construction of the Treaty term "grant, allowance, and other similar payments", we follow closely the Fourth Circuit's opinion in *Baturin.* As the closest domestic tax law analog, respondent points us to section 117, which exempts from taxation as a "'qualified scholarship' . . . any amount received by an individual as a scholarship or *fellowship grant.*" *See Baturin v. Commissioner*, 31 F.4th at 174 (quoting § 117(b)). "[A] fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." *Id.* (quoting Treas. Reg. § 1.117-3(c)).

> Treas. Reg. § 1.117-4 Items not considered as scholarship or fellowship grants.
>      The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:
>      . . . .
>
>      (c) Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) Except as provided in [two inapplicable sections], any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.
>      (2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

A payment may be "a scholarship or fellowship grant . . . if the primary purpose of the . . . research is to further the education and training of

**[*15]** the recipient . . . [and the payments do] not represent compensation or payment for . . . services." *Id.* para. (c)(2).

The Supreme Court, interpreting and upholding the above regulations, noted that "the definitions supplied by [Treasury Regulation § 1.117-4] clearly are prima facie proper, comporting as they do with the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients." *Bingler v. Johnson*, 394 U.S. 741, 751 (1969). The Supreme Court's distinction in *Johnson* parallels the Treaty's distinction between Article 14's taxable "salaries, wages, and other similar remuneration" and Article 18's tax-exempt "grant, allowance, or other similar payments." Because the Treaty directs us to U.S. law, and because of the parallels between the *Johnson* framework and the Treaty's structure, we look to section 117 and its implementing regulations to inform whether payments are tax-exempt "grant[s], allowance[s], or other similar payments" under Treaty Article 18.

*Johnson* involved Westinghouse Electric engineers who, through a company program, took leaves of absence to receive postgraduate education at local universities. *Johnson*, 394 U.S. at 742–44. In that case, Westinghouse paid these engineers "[t]uition remuneration" and "stipend[s]" during their studies but required the engineers to agree "to return to the employ of Westinghouse for a period of at least two years following completion of [their] leave[s]." *Id.* The Supreme Court held that these payments were taxable: "[T]he definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients." *Id.* at 751. Because "Westinghouse unquestionably extracted a *quid pro quo*," *id.* at 757, the Court held these payments to be taxable compensation, rather than tax-exempt grants.

### D.     *The* Baturin *factors*

Determining into which of the two categories a payment falls—taxable salary or non-taxable grant—is a factual question. *Baturin*, 31 F.4th at 177. In its opinion remanding *Baturin* to this Court, the Fourth Circuit posed the following questions as relevant to such a determination:

**[\*16]** [1] If not [the taxpayer], would [the organization] have brought someone else to work on [the project]? [2] Did the projects [the taxpayer] worked on pre- and/or post-date his tenure at [the organization], or were they dependent on his presence? [3] Did [the organization] retain the rights to the product of [the taxpayer's] research? [4] How much discretion did [petitioner] have to direct the day-to-day performance of his work? [5] In short, was there a "substantial quid pro quo" here?

*Id.* at 177–78 (citation omitted) (quoting *Johnson*, 394 U.S. at 751). We hereafter refer to these questions as "the *Baturin* factors."

In the instant case, we agree with respondent's contention that all the *Baturin* factors favor the classification of Dr. Kramarenko's salary payments from MUSC during 2010 and 2011 not as grants but rather as compensation for her services to the MUSC departments at which she worked.

> 1. *If not Dr. Kramarenko, would Drs. Cunningham and Krupenko*[15] *have brought in someone else to work in their labs?*

Dr. Cunningham could have brought someone on instead of Dr. Kramarenko to perform research for the project and would have done so if Dr. Kramarenko had not been available. Indeed, Dr. Cunningham filled Dr. Kramarenko's position with graduate students until she hired her.

> 2. *Did the projects Dr. Kramarenko worked on pre- and/or post-date her tenure at Drs. Cunningham and Krupenko's labs?*

Dr. Cunningham's project did pre-date Dr. Kramarenko's tenure, because when Dr. Kramarenko began working in Dr. Cunningham's laboratory in August 2008, Dr. Cunningham's research project had already been proceeding for years. If Dr. Kramarenko had left Dr. Cunningham's laboratory, the grant would not have terminated;

---

[15] The following discussion describes the facts in Dr. Cunningham's laboratory; but as we have noted, the facts as to Dr. Krupenko's laboratory are materially the same.

[*17] rather, Dr. Cunningham could and would have continued with her work, employing other scientists as needed.

>    3.    *Did Drs. Cunningham and Krupenko's labs retain the rights to the product of Dr. Kramarenko's research?*

MUSC, rather than Dr. Kramarenko, retained the patent rights arising from Dr. Cunningham's laboratory. Dr. Kramarenko did give a presentation about her research at a conference; she co-authored multiple published papers about the research she and the scientists she worked for performed; and she helped prepare several publications which advanced the careers of the MUSC scientists who employed Dr. Kramarenko as well as MUSC's overall research mission. All of those activities are part of MUSC's regular business as a research university, and Dr. Kramarenko does not appear to have had any rights to those publications nor the research they described.

>    4.    *How much discretion did Dr. Kramarenko have to direct the day-to-day performance of her work?*

Dr. Kramarenko had only a modest amount of discretion in her day-to-day work in Dr. Cunningham's laboratory. As she gained experience and gained the respect of Dr. Cunningham, Dr. Kramarenko was supervised less intensively and worked more independently, but she was always working at Dr. Cunningham's direction on tasks subordinate to Dr. Cunningham's overall project. Dr. Kramarenko was not free to work on her own initiative on her own projects, nor to work in any MUSC laboratory without permission. Rather, Dr. Cunningham directed and supervised Dr. Kramarenko's work.

Budgeting was done by the grant applicant as part of the grant application. The MUSC scientists who were awarded the grants in the record were not free to do whatever they would with the money; they were required to keep their research within the scope of the grants, and their ability to spend the grant money was subject to institutional control by MUSC.

Dr. Kramarenko worked 40 to 70 hours per week in Dr. Cunningham's laboratory, and she later worked similar hours in Dr. Krupenko's laboratory. In both circumstances the experiments Dr. Kramarenko performed had to be within the express confines of the principal researcher's grant, and the principal researcher determined

**[\*18]** the direction of Dr. Kramarenko's experiments and determined what needed to be done to accomplish the experiments.

5.     *Was there a "substantial quid pro quo"?*

After the first four *Baturin* factors, the Fourth Circuit's opinion states "[i]n short", and then gives the "*quid pro quo*" principle (derived from *Johnson*, 394 U.S. at 751) in what we treat as a fifth factor, though it apparently expresses a summary of the factors.     During Dr. Cunningham's testimony, we put to her a question about the presence or absence of a "quid pro quo" relationship between Dr. Kramarenko and the laboratory, and Dr. Cunningham testified that "a postdoctoral fellow is not for the purpose of producing a widget . . . . [T]he fellowship is for the purpose of training the postdoc", rather than merely to compensate Dr. Kramarenko as an employee tasked with "produc[ing] widget[s]", Dr. Cunningham's metaphor that we understand to mean that Dr. Kramarenko did not do menial repetitive tasks under close instruction but instead exercised (as we have found) some measure of judgment and discretion in doing her work. Dr. Cunningham further explained that "the postdoctoral part means that she has a Ph.D[,] and the fellow part means that she is a trainee." That is, in Dr. Cunningham's view, post-doc fellowships under NIH grants accomplish two purposes: To the laboratory, the fellowships provide Ph.D.-educated fellows who possess skills "that they can bring to a project in terms of techniques and expertise[]"; and to the fellows, the fellowships provide "a mentor training experience . . . on their journey to becoming an independent scientist."  Even in the absence of widgets, and even in the context of respected professionals, we conclude that this constitutes a substantial quid pro quo: The post-doc provides to the organization her "techniques and expertise", and the organization provides to her a "mentor training experience"—and a salary.

Dr. Kramarenko testified that her role was not to create a product or service that benefited MUSC, but rather to "engage[] actively in scientific training and gaining of expertise."   We agree that the arrangement had the intended benefit of giving training to Dr. Kramarenko, but we think it is also clear—and critical to the arrangement—that Dr. Kramarenko did provide a service, i.e., research, that benefited MUSC.

Before posing "In short" the quid pro quo question, the *Baturin* opinion inserts a citation: "*Cf.* Rev. Rul. 80-36, 1980 WL 129605, \*1 (outlining relevant considerations to determine whether researchers'

**[*19]** income was tax-exempt under U.S.-Japan Income Tax Convention)." *Baturin v. Commissioner*, 31 F.4th at 178. That Revenue Ruling states the general principle that tax exemption "does not extend to professional researchers receiving compensation for performing research services"—a generality that includes Dr. Kramarenko. *See* Rev. Rul. 80-36, 1980-1 C.B. 366, 368. The Revenue Ruling explains that a researcher may be exempt from tax where she is paid for effort "in the pursuit of a specific research goal", where her "work is not subject to direction or supervision by any other person, and [she] is entitled, but not required to publish the results of the research" and where "[n]o other person has any right to the product of [her] research"; but that does not describe Dr. Kramarenko. *See id.* Rather, in the words of the Revenue Ruling, we hold that Dr. Kramarenko was "performing valuable research services under the supervision of the grantor [i.e., MUSC] that are primarily for the benefit of the grantor of the payments", a circumstance in which the payments are subject to tax. *See id.*

MUSC received the benefit of Dr. Kramarenko's full-time skilled labor working on specific research projects as a condition of Dr. Kramarenko receiving ordinary compensation in the form of a salary (with regular increases) and various other benefits incidental to employment. In other words MUSC required a substantial quid pro quo from Dr. Kramarenko in the form of her services.

IV.  *Accuracy-related penalty*

A.  *Applicability of the penalty*

Section 6662(a) imposes an "accuracy-related penalty" equal to 20% of the portion of the underpayment of tax that is attributable to any "substantial understatement of income tax." § 6662(b)(2). For the purposes of section 6662(b)(2) and (d)(1)(A), an understatement[16] of income tax is "substantial" if it exceeds the greater of "10 percent of the tax required to be shown on the return" or $5,000.[17]

---

[16] An "understatement" is defined as the excess of the amount of tax required to be shown on the return over the amount of tax which is shown on the return. § 6662(d)(2)(A).

[17] Under section 6662(b)(1), the accuracy-related penalty is also imposed where an underpayment is attributable to the taxpayer's negligence or disregard of rules or regulations; and respondent argues that Dr. Kramarenko's omission of the income reflects negligence. However, as we show below, respondent has demonstrated that

**[\*20]** Under section 7491(c), the Commissioner has the "burden of production" with respect to liability for the penalty. Respondent has shown that Dr. Kramarenko did not report any of the tax required to be shown on her income tax returns for 2010 and 2011 and that the resulting deficiencies for both years exceed $5,000. That is, respondent has met his burden to show that the understatements of income tax were substantial. The accuracy-related penalty is mandatory; the statute provides that it "shall be added." § 6662(a). Petitioner therefore bears the burden of proving any defense of reasonable cause and good faith. *See Higbee v. Commissioner*, 116 T.C. 438, 446 (2001).

B.  *"Reasonable cause" and "good faith"*

Section 6664(c)(1) provides that, if the taxpayer shows, first, that there was reasonable cause for a portion of an underpayment and, second, that she acted in good faith with respect to such portion, then no accuracy-related penalty shall be imposed with respect to that portion. *See Higbee*, 116 T.C. at 446–47. Whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's knowledge and experience (and the extent to which she relied on the advice of a tax professional, a fact not alleged here). Treas. Reg. § 1.6664-4(b)(1). When evaluating reasonable cause, "the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." *See id.*

Dr. Kramarenko invokes this defense with her testimony that, while she may have made mistakes on her tax returns, they were innocent mistakes. However, we cannot say that Dr. Kramarenko proved either "good faith" or "reasonable cause." Dr. Kramarenko received from MUSC Forms W–2, "Wage and Tax Statement," reporting that she received taxable wages of $41,681 in 2010 and $42,885 in 2011. On the sole basis of her reading of the Treaty and on her conversations with colleagues, and without the advice of a tax professional, Dr. Kramarenko filed income tax returns for years since at least as early as 2007 showing zero taxable income, on the ground that (she concluded) her entire salary from MUSC was excluded from taxation under the Treaty—contrary to the position reflected on the Forms W–2 that MUSC issued to her every year.

---

Dr. Kramarenko substantially understated her income tax for tax years 2010 and 2011. Thus, we need not consider whether, under section 6662(b)(1), Dr. Kramarenko was negligent or disregarded rules or regulations.

[*21] In addition to erroneously omitting her salary income, Dr. Kramarenko made several misrepresentations on her 2010 and 2011 income tax returns, including using a filing status of "single nonresident alien" when she was in fact a married resident alien. Dr. Kramarenko also misrepresented on Forms 8840 attached to her income tax returns that her tax home was Russia and that she had a closer connection to Russia than to the United States, even though at the time she was preparing those returns she had lived with her American husband in their marital home in South Carolina since 2008.

Dr. Kramarenko knew, when preparing her 2011 return, that her visa status had changed in 2011; and at trial she admitted that she had been unsure whether it was proper to claim exemption under the Treaty for taxable year 2011, specifically during the last four months of the year (when she had an H1B visa), and that claiming the exemption was "kind of questionable"; yet she claimed it anyway. She has thus failed to prove the "most important factor"—i.e., "the taxpayer's effort."

These substantial understatements of income tax were not attributable to reasonable cause and good faith.

V.    *Conclusion*

For the tax years 2010 and 2011, Dr. Kramarenko is not entitled to exclude her compensation from MUSC from taxable income under Treaty Article 18, and she did not have reasonable cause to relieve her from penalty liability for the resulting understatements.

To reflect the foregoing,

*Decision will be entered for respondent.*