**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1648**

VITALY NIKOLAEVICH BATURIN,

      Petitioner – Appellee,

  v.

COMMISSIONER OF INTERNAL REVENUE,

      Respondent – Appellant.

------------------------------

AARON Z. ROPER,

      Court-Assigned Amicus Counsel.

Appeal from the United States Tax Court.  (Tax Ct. No. 014796-14)

Argued:  March 8, 2022                      Decided:  April 6, 2022

Before MOTZ and DIAZ, Circuit Judges, and KEENAN, Senior Circuit Judge.

Reversed and remanded by published opinion.  Judge Motz wrote the opinion, in which Judge Diaz and Senior Judge Keenan joined.

**ARGUED:**  Ivan C. Dale, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant.  Aaron Z. Roper, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Court-Assigned Amicus Counsel.  Vitaly Nikolaevich Baturin, Appellee Pro Se.

**ON BRIEF:** David A. Hubbert, Acting Assistant Attorney General, Joan I. Oppenheimer, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant.

_____

DIANA GRIBBON MOTZ, Circuit Judge:

The Tax Court held that payments to a Russian scientist working in the United States were exempt from taxation under the United States-Russia Tax Treaty.[1] In doing so, the Tax Court misunderstood the basis of the Treaty's distinction between a tax-exempt "grant, allowance, or other similar payments" and taxable "salaries, wages, and other similar remuneration." For this reason, we reverse and remand for further proceedings consistent with this opinion.

I.

In 2010 and 2011 (the two years at issue here), Dr. Vitaly Baturin, a Russian national and physicist, worked at Jefferson Lab, a Department of Energy facility in Newport News, Virginia. Jefferson Lab operates a particle accelerator, which smashes particles together to help researchers learn about the structure of the universe. Dr. Baturin's work involved a detector that would better enable researchers to see what happens at the sub-atomic level inside the accelerator.

During this period, Dr. Baturin held a J-1 exchange visitor visa as a researcher sponsored by Jefferson Lab. He received W-2s from Jefferson Lab that reflected income of $76,729 and $79,061, in 2010 and 2011, respectively, for "wages, tips, [or] other comp[ensation]." He filed 1040-NR (nonresident) forms with the IRS, which claimed an

---

[1] The Treaty's full title is the "Convention Between the United States of America and the Russian Federation for the Avoidance of Double Taxation and the Prevention off Fiscal Evasion with Respect to Taxes on Income and Capital." *See* June 17, 1992, T.I.A.S. No. 93-1216; S. Treaty Doc. No. 102-39. The United States signed the Treaty in 1992 and the Senate ratified it in 1993, shortly after the dissolution of the Soviet Union.

exemption as to the entire amount he earned from Jefferson Lab each year pursuant to the United States-Russia Tax Treaty. In 2014, the IRS issued Dr. Baturin a Notice of Deficiency, stating that he owed a total of $22,229 in income taxes on his payments from Jefferson Lab for 2010 and 2011. After some administrative discussions, Dr. Baturin *pro se* petitioned the Tax Court, arguing that the Treaty exempted his income from taxation.

The Tax Court agreed with Dr. Baturin, holding that the Treaty shielded from taxation his entire income in 2010 and 2011 as "a grant, allowance, or similar payments." The Tax Court rejected the argument of the Commissioner of Internal Revenue that wages are categorically ineligible for exemption from taxation under the Treaty, reasoning that "wages may be eligible for exemption so long as they are similar to a grant or allowance." Tax Ct. Op. at 19.

The Commissioner then noted this appeal, over which we have jurisdiction pursuant to I.R.C. § 7482(a)(1).[2] "Decisions of the tax court are subject on appeal to the same standard we apply to civil bench trials on appeal from the district courts. Under this standard, we review factual findings for clear error, legal questions de novo, and mixed questions of law and fact de novo." *QinetiQ US Holdings, Inc. v. Comm'r*, 845 F.3d 555, 562 (4th Cir. 2017) (internal citations omitted). "Interpretation of an international treaty is an issue of law subject to de novo review." *United States v. Al-Hamdi*, 356 F.3d 564, 569 (4th Cir. 2004). And "[t]he general rule . . . is that a taxpayer claiming immunity from a

---

[2] We appointed amicus counsel to argue in support of the Tax Court's decision. Amicus provided an excellent brief and argument, which we very much appreciate.

tax has the burden of establishing his exemption." *Norton Co. v. Dep't of Rev.*, 340 U.S. 534, 537 (1951).

II.

Ordinarily, any income that a nonresident alien receives for personal services in the United States is taxable in this country. *See* I.R.C. §§ 864(b)(1); 872(a). However, "[t]he provisions of [the tax code] shall be applied to any taxpayer with due regard to any treaty obligation of the United States which applies to such taxpayer." *Id.* § 894(a)(1). Thus, to resolve the case at hand, we must consider the United States-Russia Tax Treaty.

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellín v. Texas*, 552 U.S. 491, 506 (2008). Two articles of that Treaty are particularly relevant here. On the one hand, Article 14 of the Treaty provides:

> Subject to the provisions of Articles 15 (Directors' Fees), 16 (Government Service), and 17 (Pensions), *salaries, wages, and other similar remuneration* derived by a resident of a Contracting State [*i.e.*, the United States or Russia] in respect of an employment shall be taxable only in that State unless the employment is exercised in the other Contracting State. If the employment is so exercised, such remuneration as is derived therefrom may be taxed in that other State.

Art. 14(1) (emphasis added). On the other hand, Article 18 provides:

> An individual who is a resident of a Contracting State at the beginning of his visit to the other Contracting State and who is temporarily present in that other State for the primary purpose of: . . . (c) studying or doing research as a recipient of a *grant, allowance, or other similar payments* from a . . . scientific . . . organization, shall be exempt from tax by that other State . . . with respect to the grant, allowance, or other similar payments.

5

Art. 18(1).[3]

The text of the Treaty does not define what differentiates "salaries, wages, and other similar remuneration" in Article 14 from a "grant, allowance, or other similar payments" in Article 18.  But the text does tell us that these categories are mutually exclusive, given the simple fact that one is taxable and the other is not.

The legislative history of the Treaty's ratification reinforces our conclusion that salaries and grants are exclusive categories.  *See United States v. Stuart*, 489 U.S. 353, 366–67 (1989) (using legislative history of Senate ratification to establish a treaty's meaning).  Before the Senate ratified the Treaty, the Assistant Secretary for Tax Policy testified to the Senate Foreign Relations Committee that although "[s]pecial tax relief applies to grants . . . received by . . . researchers . . . the new treaty does not preserve the [predecessor Convention With the Union of Soviet Socialist Republics on Matters of Taxation, U.S.-U.S.S.R., June 20, 1973, 27 U.S.T. 3 (hereinafter "United States-Soviet Union Tax Treaty")] two year exemption of personal service income earned by . . . researchers . . . .  It is not the policy of . . . either of the two countries to provide special exemptions of the compensation earned by . . . researchers." *See Tax Conventions With: The Russian Federation, Treaty Doc. 102-39; United Mexican States, Treaty Doc. 103-7; the Czech Republic, Treaty Doc. 103-17; the Slovak Republic, Treaty Doc. 103-18; and the Netherlands, Treaty Doc. 103-6.  Protocols Amending Tax Conventions With: Israel,*

---

[3] Articles 18(2) and 18(3) set out a five-year time limit and a provision allowing for taxation of income from research "undertaken not in the public interest but primarily for the private benefit of a specific person or persons," respectively.  Neither of these provisions is at issue in this case.

6

*Treaty Doc. 103-16; the Netherlands, Treaty Doc. 103-19; and Barbados, Treaty Doc. 102-41, Before the Sen. Foreign Relations Comm.*, 103rd Cong., S. Hrg. 103-335, at 26 (1993) (statement of Leslie B. Samuels, Assistant Sec'y for Tax Pol'y, Treasury Dep't) [hereinafter "Senate Hearing"].[4] In short, the United States and Russia intentionally drafted the Tax Treaty to narrow a prior exemption that had covered a much broader swathe of researchers' compensation.

Thus, given the Treaty's text and history, we must reject the Tax Court's holding that under the Treaty, "wages may be eligible for exemption so long as they are similar to a grant or allowance." Tax Ct. Op. at 19. The argument of amicus in support of this theory that "[g]rants are routinely paid out as salaries" misses the mark for the same reason. Amicus Br. at 28. Grants may be dispersed *periodically*, but for purposes of the Treaty, a grant paid as a salary is an oxymoron. The two are dichotomous and mutually exclusive. Either payments are Article 14 wages, salaries, or similar remuneration (and taxable); or they are Article 18 grants, allowances, or other similar payments (and thus tax-exempt). They cannot be both.

---

[4] Article VI(1)(c)(1) of the United States-Soviet Union Tax Treaty provides: "An individual who is a resident of one of the Contracting States and who is temporarily present in the other Contracting State at the invitation of a . . . scientific research institution in that other Contracting State for the primary purpose of . . . engaging in research . . . shall not be subject to tax in that other Contracting State on his income from . . . research." As should be immediately apparent from the text, this exemption is far broader than the current United States-Russia Tax Treaty's exemption for grants, allowances, and similar payments. The United States-Soviet Union Tax Treaty still applies with respect to former Soviet states that have not signed successor tax treaties with the United States, such as Belarus.

The central question in this case is thus whether Jefferson Lab's payments to Dr. Baturin are taxable as "salar[y], wages, [or] other similar remuneration" under Article 14, or tax-exempt as "grant, allowance, or other similar payments" under Article 18.

III.

A.

Beyond establishing mutual exclusivity, however, the United States-Russia Tax Treaty is not very helpful in defining what *distinguishes* salaries and wages from grants and allowances. But Article 3(2) of the Treaty gives some guidance. It provides:

> As regards the application of the Convention by a Contracting State, any term not defined therein shall, unless the context otherwise requires or the competent authorities agree to a common meaning pursuant to [an inapplicable section], have the meaning which it has *under the laws of that State concerning the taxes to which this Convention applies.*

Art. 3(2) (emphasis added); *see also* Rebecca M. Kysar, *Interpreting Tax Treaties*, 101 Iowa L. Rev. 1387, 1412 (2016) ("Tax treaties . . . invoke domestic law concepts by leaving terms vague . . . . The characterization of income is one such area, the outcome of which has a profound effect on tax liability.").

We turn, then, to the law of the United States. As the closest domestic tax law analogue, the Commissioner points us to I.R.C. § 117, which exempts from taxation as a "'qualified scholarship' . . . any amount received by an individual as a scholarship or *fellowship grant*." I.R.C. § 117(b) (emphasis added). The implementing regulations provide: "[a] fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." Treas. Reg. § 1.117-3(c).

8

The regulations further provide:

The following payments or allowances *shall not be* considered to be amounts received as a scholarship or *a fellowship grant* for the purpose of section 117: . . . (c) Amounts paid as compensation for services or primarily for the benefit of the grantor.

>> (1) Except as provided in [two inapplicable sections], any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation *for past, present, or future employment services* or represents payment *for services which are subject to the direction or supervision of the grantor*.
>> (2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research *primarily for the benefit of the grantor.*

Treas. Reg. § 1.117-4 (emphasis added). Such payments are "a scholarship or fellowship grant . . . if the primary purpose of the . . . research is to further the education and training of the recipient . . . [and the payments do] not represent compensation or payment for . . . services." *Id.*[5]

The Supreme Court interpreted and upheld these regulations in *Bingler v. Johnson*, 394 U.S. 741 (1969). *Bingler* involved Westinghouse Electric engineers who, through a company program, took leaves of absence to receive postgraduate education at local universities. *Id.* at 742–44. Westinghouse paid these engineers "tuition remuneration" and

---

[5] The Tax Court declined to consider I.R.C. § 117, reasoning that if an Article 18 "grant" meant the same thing as a § 117(a) "fellowship grant," the Treaty's "grant" exemption would be superfluous. Tax Ct. Op. at 12. But § 117's exemption only covers "scholarships and fellowship grants" for "qualified tuition and related expenses" at certain educational institutions. I.R.C. § 117(b). Article 18 of the Treaty, in contrast, has no such expense-specific restrictions, and a grant need only be "from a . . . scientific . . . organization." Thus, the two provisions are not coterminous. Rather, I.R.C. § 117, a provision of domestic law that Article 3(2) of the Treaty tells us to consider, properly informs our understanding of Article 18.

9

"stipend[s]" during their studies, but required the engineers to agree "to return to the employ of Westinghouse for a period of at least two years following completion of [their] leave[s]." *Id.* at 742–44. The Supreme Court held that these payments were taxable: "the definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial quid pro quo from the recipients." *Id.* at 751. Because "Westinghouse unquestionably extracted a quid pro quo," *id.* at 757, the Court held these payments to be taxable compensation, rather than tax-exempt grants.

In short, *Bingler* draws a line between work done as part of a "substantial quid pro quo," which is taxable as compensation, and "relatively disinterested, 'no-strings' educational grants," which are tax-exempt. *Id.* at 751. This distinction parallels the United States-Russia Tax Treaty's distinction between taxable "salaries, wages, and other similar remuneration" and a tax-exempt "grant, allowance, or other similar payments."[6] Because the Treaty directs us to U.S. law, and because of the parallels between the *Bingler*

---

[6] The Commissioner relies on several revenue rulings that interpret the phrase "grant, allowance or award" in the then-operative U.S.-Japan Income Tax Convention and similar tax treaties. Comm'r Br. at 30–32 (first citing Rev. Rul. 80-36, 1980-1 C.B. 366, 1980 WL 129605, and then citing Rev. Rul. 87-40, 1987-1 C.B. 372, 1987 WL 383678). These revenue rulings rely in part on I.R.C. § 117 and its implementing regulations. We usually do defer to the Executive Branch's interpretation of a treaty. *See Abbott v. Abbott*, 560 U.S. 1, 15 (2010). But because these revenue rulings interpret a different (albeit similar) treaty, and because "revenue rulings are entitled to considerably less deference than an agency's properly promulgated regulations," *Dominion Res., Inc. v. United States*, 219 F.3d 359, 366 (4th Cir. 2000), we do not here rely on them except to illustrate the viability of drawing on I.R.C. § 117 in the tax-treaty context.

framework and the Treaty's structure, we look to I.R.C. § 117 and its implementing regulations to inform whether payments are tax-exempt "grant[s], allowance[s], or other similar payments" under Article 18 of the United States-Russia Tax Treaty.

B.

Amicus makes two arguments against relying on *Bingler*'s quid pro quo framework here. First, he contends that *Bingler* and the relevant regulations involved a prior version of the statute, which Congress has since altered. Amicus Br. at 34–35. It is true that Congress revised the statute in 1986. *See* 100 Stat. 2085, 2112 (1986). But that revision did not eliminate the concept of fellowship grants. Rather, it deleted a separate exemption for "research expenses," but retained the exemption for "fellowship grants" as a kind of "qualified scholarship." *Id.* Courts have continued to apply *Bingler*'s quid pro quo framework to the revised tax code. *See, e.g.*, *United States v. Mem. Sloan-Kettering Cancer Ctr.*, 563 F.3d 19, 30–32 (2d Cir. 2009); *United States v. Det. Med. Ctr.*, 557 F.3d 412, 416 (6th Cir. 2009). Thus, *Bingler*'s distinction between "'no strings' educational grants" and payments for compensation made as part of a "substantial quid pro quo" is still very much part of United States tax law. 394 U.S. at 751.

Next, amicus contends that the Commissioner's interpretation of Article 18 "grants," which mirrors Treas. Reg. § 1-117.4(c)'s exclusion of "payment for services which are subject to the direction or supervision of the grantor," is "staggeringly broad," and if the exemption in Article 18 of the Treaty were interpreted as the Commissioner contends, it would cover only "a tiny sliver of grantees." Amicus Br. at 35. This is so, amicus asserts, because "[e]ssentially all grants are 'subject to the direction or supervision

11

of the grantor.'" *Id.* But this argument ignores the regulations. They provide that "[n]either the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefits to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant." Treas. Reg. § 1-117.4(c).

IV.

Two other arguments bear mentioning here. First, amicus and the Tax Court point to the United States-Russia Tax Treaty's preamble, which proclaims its purpose to be the promotion of "scientific . . . cooperation." Tax Ct. Op. at 12; Amicus Br. at 21–22. Amicus argues that exempting Dr. Baturin's income from taxation advances this salutary purpose, such that we must affirm the Tax Court's decision. We disagree.

Although it is true that "[t]reaties generally are liberally construed," *Tabion v. Mufti*, 73 F.3d 535, 537 (4th Cir. 1996), "[i]t is a mistake to allow general language of a preamble to create an ambiguity in specific . . . treaty text where none exists." *Jogi v. Voges*, 480 F.3d 822, 834 (7th Cir. 2007). And "[w]e may not read international treaties so broadly as to create unintended benefits or to reach parties not within the scope of a treaty's language." *Int'l Bank for Reconstr. & Dev. v. Dist. of Columbia*, 171 F.3d 687, 691 (D.C. Cir. 1999) (citing *Maximov v. United States*, 373 U.S. 49, 55–56 (1963)). This seems especially so when, as here, the cited language does not appear in operative text.

Moreover, courts construe treaties liberally to effectuate the intent of the parties, not simply in favor of the party invoking the treaty. *See Nielsen v. Johnson*, 279 U.S. 47, 51 (1929) ("Treaties are to be liberally construed, so as to effect the apparent intention of the

12

parties."). Here, the intent of the parties to the Treaty was to balance the promotion of scientific cooperation with each country's sovereign right to tax productive activities within its borders. Indeed, as the legislative history makes clear, the United States-Russia Tax Treaty was deliberately written to narrow the United States-Soviet Union Tax Treaty's broad "exemption of personal service income earned by . . . researchers." Senate Hearing at 26. Adopting the arguments of amicus and the Tax Court would effectively rewrite that history and ignore the actual intent of the Treaty.

Second, Dr. Baturin argues that his immigration status renders him *per se* eligible for Article 18's exemption. He points to his DS-2019, a form necessary to obtain a J-1 exchange visa. An applicant's sponsor (here, Jefferson Lab) fills out the DS-2019 and the applicant signs it to verify the document's accuracy. One box on the form, Box 5, asks for the following information: "During the period covered by this form, the total estimated financial support (in U.S. $) is to be provided to the exchange visitor by:" Jefferson Lab filled in Box 5 as follows:

> 5. During the period covered by this form, the total estimated financial support (in U.S. $) is to be provided to the exchange visitor by:
>
> **Current Program Sponsor funds: $75,000.00**
> **Total: $75,000.00**

Dr. Baturin argues that this "money, allotted in the DS[-]2019 certificate, [was] used to fund the specified . . . research program." Baturin Br. at 11 (emphasis deleted). Thus, he contends, "the funds specified in block 5 of the Taxpayer's DS[-]2019 certificate satisfy the requirements of the Treaty Art. 18 as [an] allowance (or grant), and, therefore, the

13

Taxpayer is exempt from taxes." *Id.* at 12 (emphasis deleted). Dr. Baturin similarly argued[7] to the Tax Court:

> Baturin:       [A]fter the funds are secured, the sponsor selects an exchange visitor, only after [the funds are] secured, put into some box and locked.
>
> The Court:   How is the amount established?
>
> Baturin:       How the amount is established? It's specified in the DS[-]2019 Form per year.

In short, Dr. Baturin argues that Box 5 represents a pot of money set aside specifically for him — *i.e.*, a grant.

Even assuming that Jefferson Lab set aside this money specifically for Dr. Baturin, that does not make it a grant. As amicus necessarily conceded at argument, an employer might well earmark certain funds for payroll. Oral Argument at 33:16–33:30, *Baturin v. Comm'r*, (4th Cir. Mar. 8, 2022) (No. 20-1648), https://www.ca4.uscourts.gov/OAarchive/mp3/20-1648-20220308.mp3. Amicus similarly had to acknowledge that under this theory, if those employees were researchers, the employer's mere setting aside of payroll funds could constitute a tax-exempt "grant." *Id.* But it is not the internal accounting method of a grantor/employer that matters here. It

---

[7] Amicus contends that Dr. Baturin so testified, rather than argued, and that the Tax Court's conclusions as to the meaning of Box 5 thus constitute factual findings that we review for clear error. Amicus Br. at 38–42. But the transcript is quite clear that Dr. Baturin developed his understanding of the program and Box 5 not from any statement or assurance made to him, but from his reading of the relevant J-1 visa program regulations. So Dr. Baturin's "testimony" is really legal argument, and the Tax Court's conclusions as to the meaning of Box 5 are thus legal, rather than factual. In any case, as discussed herein, whether this money was specifically set aside for Dr. Baturin is largely irrelevant to whether those funds are a "grant."

is instead whether there is a "requirement of any substantial quid pro quo" that distinguishes compensation for employment from a "relatively disinterested, 'no-string'" grant. *Bingler*, 394 U.S. at 751.

## V.

The Tax Court, of course, did not have the benefit of our decision when it heard testimony and decided this case. As a result, the record is not entirely clear as to the specifics of Dr. Baturin's relationship with Jefferson Lab. We are not a fact-finding body, and the question of how best to characterize the payments at issue here is a largely fact-dependent question.

Thus, on remand, the Tax Court should determine what Jefferson Lab gained from having Dr. Baturin on staff. In doing so, the court should consider, for example, the following questions: If not Dr. Baturin, would Jefferson Lab have brought someone else to work on upgrading the detector? Did the projects Dr. Baturin worked on pre- and/or post-date his tenure at Jefferson Lab, or were they dependent on his presence? Did Jefferson Lab retain the rights to the product of Dr. Baturin's research? How much discretion did Dr. Baturin have to direct the day-to-day performance of his work? *Cf.* Rev. Rul. 80-36, 1980 WL 129605, *1 (outlining relevant considerations to determine whether researchers' income was tax-exempt under U.S.-Japan Income Tax Convention). In short, was there a "substantial quid pro quo" here? *Bingler*, 394 U.S. at 751. We trust the Tax

Court to answer these questions, and we think it appropriate to allow that court the opportunity to apply the framework we have described here in the first instance.

*REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION*