# United States Tax Court

T.C. Memo. 2026-12

VITALY NIKOLAEVICH BATURIN,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 14796-14.                    Filed February 5, 2026.

————————

In 2010 and 2011 P, a citizen of the Russian Federation, was in the United States as a nonresident under a J–1 visa as an "Exchange Visitor" to work as a research scientist at a Department of Energy facility. The remuneration he received from the facility was not disinterested, no-strings grants, but rather was given in exchange for his assigned work on a specific project. P filed income tax returns that reported the remuneration but claimed exemption from tax pursuant to Article 18 of the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital, Russ.-U.S. ("the Treaty"), June 17, 1992, T.I.A.S. No. 93-1216.

On audit the IRS concluded that the income was non-exempt and determined a deficiency in tax. P petitioned this Court, which after trial held in favor of P. R appealed, and the U.S. Court of Appeals for the Fourth Circuit reversed and remanded, instructing this Court to determine whether P's services were a quid pro quo for his remuneration.

On remand, R moved for summary judgment on the grounds that the payments at issue were compensation for

**[\*2]** P's services and not a nontaxable grant, allowance, or other similar payment under the Treaty.

> *Held*: On the basis of the undisputed material facts in the record, the payments at issue were compensation for P's services and were not a nontaxable "grant, allowance, or other similar payment[]" under the Treaty. R's motion for summary judgment will be granted.

————————

Vitaly Nikolaevich Baturin, for himself.

*Timothy B. Heavner*, *Chelsey M. Pearson*, and *Wendy C. Yan*, for respondent.

### SUPPLEMENTAL MEMORANDUM OPINION[1]

GUSTAFSON, *Judge*: Petitioner, Vitaly Nikolaevich Baturin, contends that payments he received from the Thomas Jefferson National Accelerator Facility ("Jefferson Lab") in 2010 and 2011 were exempt from U.S. income tax pursuant to Article 18 of the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital ("U.S.-Russia Tax Treaty" or "the Treaty"), Russ.-U.S., June 17, 1992, T.I.A.S. No. 93-1216.[2] This Court previously held in favor of Dr. Baturin, *Baturin I*, 153 T.C. 231, but the U.S. Court of Appeals for the Fourth Circuit reversed and remanded, though it left undisturbed many of this Court's findings of fact, *see Baturin II*, 31 F.4th at 172. The Fourth Circuit's opinion concluded with questions that should be addressed on remand. *Id.* at 177–78. After the Fourth Circuit's remand, the parties filed additional stipulations of fact.[3]

---

[1] This Opinion supplements our previous opinion in *Baturin v. Commissioner*, 153 T.C. 231 (2019) (*Baturin I*), *rev'd and remanded*, 31 F.4th 170 (4th Cir. 2022) (*Baturin II*).

[2] The Treaty was suspended effective August 16, 2024. *See* Announcement 2024-26, 2024-27 I.R.B. 14.

[3] The parties' previous stipulations of fact and the testimony given in the first Tax Court trial retain their status as evidence in this case, and they are supplemented by the subsequently filed second, third, and fourth stipulations of fact.

**[\*3]**   Now before the Court is "Respondent's Motion for Summary Judgment," filed December 20, 2024, in which respondent, the Commissioner of the Internal Revenue Service ("IRS"), seeks a ruling that, on the basis of the undisputed material facts in the record, the payments at issue were taxable compensation for Dr. Baturin's services and not a nontaxable grant, allowance, or other similar payment under the Treaty.

Dr. Baturin responded to the motion, but that response fails to raise or articulate any genuine dispute of material fact with respect to the Commissioner's motion. When we consider the questions posed by the Fourth Circuit in *Baturin II*, we must grant the Commissioner's motion.

## *Background*

The following undisputed facts are derived from the parties' pleadings and stipulations of fact, our previous findings of fact not disturbed by the Fourth Circuit, and the post-remand declaration supporting the Commissioner's motion for summary judgment. As to the facts derived from that declaration, we draw inferences in favor of Dr. Baturin, as the nonmoving party, subject to the limitations provided by Rule 121(d),[4] discussed below in Part I. When Dr. Baturin filed his petition, he resided in Virginia.

### *Employment at Jefferson Lab*

Dr. Baturin is a citizen of the Russian Federation. In October 2006 he received and accepted an "offer of employment" from Jefferson Science Associates, LLC ("JSA"),[5] a Department of Energy facility in

---

[4] Unless otherwise indicated, references to Rules are to the Tax Court Rules of Practice and Procedure, and statutory references are to the Internal Revenue Code ("the Code," Title 26 of the United States Code), as in effect at the relevant times. We round monetary amounts to the nearest dollar.

[5] JSA's letter making the offer of employment is from "JSA/Jefferson Lab", indicating that JSA and "Jefferson Lab" are a single or joint employer. Dr. Baturin seems to contend that Article 14 of the Treaty (discussed below in Part II.A) does not apply to him because it applies only to individuals who get "employment," which Dr. Baturin says does not describe him, notwithstanding that he countersigned the offer letter, stating: "I understand and accept this offer of employment". If that is his contention, then it is without merit, because Dr. Baturin stipulated that he was "employed with" Jefferson Labs, because we previously found that he was an employee (*see Baturin I*, 153 T.C. at 233), and because the Fourth Circuit's opinion did not disturb that finding.

[*4] Newport News, Virginia. Beginning in 2007 and continuing during the taxable years at issue (2010 and 2011), Dr. Baturin was in the United States, where he received a J–1 visa as an "Exchange Visitor,"[6] to work as a research scientist. The parties stipulated that "[i]n 2010 and 2011, petitioner was a nonresident[7] alien, research scholar temporarily present in the United States."

Jefferson Lab operates the Continuous Electron Beam Accelerator Facility ("CEBAF"), which contains four experimental halls, A through D. Dr. Baturin was employed at Jefferson Lab from May 16, 2007, to May 15, 2015. During 2010 and 2011 Dr. Baturin worked as a staff scientist on the Jefferson Lab's 12 GeV Upgrade of the CEBAF Large Acceptance Spectrometer detectors project in Hall B ("12 GeV Upgrade Project"). Within the 12 GeV Upgrade Project, Dr. Baturin's responsibilities included designing and constructing new detectors, such as the Central Time of Flight detector. Before 2007, Dr. Baturin had done related research during 2004–06 under the auspices of Kyungpook National University ("KNU") in South Korea. Some of his time in that period was evidently spent at Jefferson Lab, but he received his compensation from KNU.

As an employee of the Jefferson Lab starting in 2007, Dr. Baturin received full salary and benefits, completed timesheets, and was paid bi-weekly. Dr. Baturin was advised in his offer of employment that his starting salary was $75,000. As with other Jefferson Lab employees,

---

[6] The designations for the pertinent varieties of nonimmigrant visas are derived from the respective subparagraphs, clauses, and subclauses of subsection (a)(15) (defining "immigrant" as "every alien" and listing the exceptions) in section 101 ("Definitions") of the Immigration and Nationality Act, ch. 477, 66 Stat. 163, 167 (1952) (codified as amended at 8 U.S.C. §§ 1101(a)(15)). Thus, a "J–1 visa" is issued pursuant to 8 U.S.C. § 1101(a)(15)(J) (providing a J–1 visa to "an alien having a residence in a foreign country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill, . . . who is coming temporarily to the United States"). *See* 22 C.F.R. §§ 41.12 tbl.1 ("J1 . . . Exchange Visitor"), 62.1(a), 62.2 (defining "J visa") (2023).

[7] On the basis of the stipulation, this Court previously found that Dr. Baturin was a nonresident alien (*see Baturin I*, 153 T.C. at 236 & n.4); and the Fourth Circuit so assumed (*see Baturin II*, 31 F.4th at 172). The Commissioner's motion argues the generality that "U.S. *resident* aliens are subject to U.S. income tax," Resp't's Mot. Summ. J. 8 (No. 95) (emphasis added), and Dr. Baturin's opposition includes some indication that this assertion unfortunately distracted him from the pertinent issues, but we do not revisit the stipulated fact that he was a nonresident alien in the United States.

**[*5]** Dr. Baturin was required to have direct deposit of his paychecks and to submit to a medical examination.

Dr. Baturin's employment with Jefferson Lab was contingent upon his satisfactory performance and the continuing availability of funds and work. Pursuant to JSA's offer letter, his employment was "governed by the policies set forth in the Jefferson Lab Administrative Manual and the procedures, practices, and interpretations relating to those policies." Dr. Baturin worked on the 12 GeV Upgrade Project in Hall B, subject to two superiors:

Dr. Latifa Eloaudrhiri was the Hall B 12 GeV Upgrade Project manager in 2010 and 2011. As the project manager, Dr. Eloaudrhiri provided supervision and guidance to Dr. Baturin and other Hall B staff on the 12 GeV Upgrade Project.

Dr. Baturin's work was also subject to the direction and supervision of Dr. Burkert, his supervisor. Dr. Burkert has worked at Jefferson Lab for over 39 years. He was Jefferson Lab's Hall B group leader from January 2003 to mid-September 2019 and was Dr. Baturin's supervisor from 2007 to 2015. As Dr. Baturin's supervisor, Dr. Burkert provided guidance and supervision over Dr. Baturin's work. Dr. Burkert also evaluated and rated Dr. Baturin's performance and prepared performance appraisals during each of the years he worked at Jefferson Lab (2007 to 2015).

The parties stipulated that on May 16, 2007, as a condition of employment with Jefferson Lab, Dr. Baturin signed an "Agreement On Intellectual Property Including Inventions, Discoveries, Technical Data, Copyrights and Proprietary Information" ("Intellectual Property Agreement"). Pursuant to the Intellectual Property Agreement, Jefferson Lab retained all the rights to the products of Dr. Baturin's work.

Dr. Burkert stated (and Dr. Baturin does not dispute) that "if Dr. Baturin did not apply for the Staff Scientist position in 2006, or if he was not available for the position in 2010 and 2011, Jefferson Lab would have hired another qualified individual for the Staff Scientist position to work on the 12 GeV Upgrade Project (to work on designing and upgrading the CTOF detector)."

In 2010 and 2011 other individuals also worked on the 12 GeV Upgrade Project in Hall B, including two scientists who worked on other detectors. The parties stipulated that the 12 GeV Upgrade Project,

**[\*6]** including the CTOF detector project, pre-dated Dr. Baturin's hiring by Jefferson Lab in 2007 and post-dated his work at Jefferson Lab, past 2015, when Dr. Baturin left the employment of Jefferson Lab. At least as late as December 2024, the CTOF detector was still in operation as part of the 12 GeV Upgrade Project.

*Tax returns and NOD*

For taxable years 2010 and 2011, Dr. Baturin filed Forms 1040–NR ("U.S. Nonresident Alien Income Tax Return"). The IRS examined those returns and sent Dr. Baturin a statutory Notice of Deficiency ("NOD") on April 1, 2014, determining that he had received income of $76,729 in 2010 and $79,060 in 2011 that was not exempt from federal income taxation. The NOD reflected the IRS's determinations of the resulting deficiencies in federal income tax of $11,088 for 2010 and $11,141 for 2011. (The NOD also reflected the IRS's determinations of accuracy-related penalties under section 6662(a) that the Commissioner has subsequently conceded.)

*Tax Court proceedings*

In response to the NOD, Dr. Baturin filed his Tax Court Petition, asserting that his income from Jefferson Lab was exempt from federal income taxation pursuant to Article 18 of the U.S.-Russia Tax Treaty. Like most Tax Court petitioners, Dr. Baturin has represented himself in this case. The Commissioner contends that wages are by definition ineligible for the Article 18 exemption.

In December 2019 this Court issued an opinion, *Baturin I*, in favor of Dr. Baturin, holding that the Treaty shielded from taxation his entire income for 2010 and 2011 as "a grant, allowance, or other similar payment[]" and that Dr. Baturin's income was therefore exempt from federal income tax. We entered decision in accordance with that opinion and the parties' computations.

*Fourth Circuit reversal*

The Commissioner appealed, and on April 6, 2022, the Fourth Circuit released its opinion, *Baturin II*, reversing our decision. The Fourth Circuit remanded the case for further proceedings, and it instructed (*Baturin II*, 31 F.4th at 177–78) that—

> on remand, the Tax Court should determine what Jefferson
> Lab gained from having Dr. Baturin on staff. In doing so,

**[*7]**    the court should consider, for example, the following questions: If not Dr. Baturin, would Jefferson Lab have brought someone else to work on upgrading the detector? Did the projects Dr. Baturin worked on pre- and/or post-date his tenure at Jefferson Lab, or were they dependent on his presence? Did Jefferson Lab retain the rights to the product of Dr. Baturin's research? How much discretion did Dr. Baturin have to direct the day-to-day performance of his work? *Cf.* Rev. Rul. 80-36, 1980 WL 129605, *1 (outlining relevant considerations to determine whether researchers' income was tax-exempt under U.S.-Japan Income Tax Convention). In short, was there a "substantial quid pro quo" here? *Bingler* [*v. Johnson*], 394 U.S. [741,] at 751, 89 S.Ct. 1439 [(1969)].

(We hereafter refer to these questions as "the *Baturin* factors.") The Fourth Circuit thus emphasized as most important the question whether there was a "substantial quid pro quo" between Jefferson Lab and Dr. Baturin. Determining into which of the two categories a payment falls—taxable salary or non-taxable grant—is a factual question. *Baturin II*, 31 F.4th at 177.

*Additional evidence on remand*

We set the case for trial to take place beginning November 25, 2024, and we gave Dr. Baturin information about obtaining assistance from pro bono attorneys, which he eventually declined.[8] We ordered the parties to attempt to stipulate additional facts in response to the opinion of the Fourth Circuit, and in October 2024 they filed three additional stipulations. On November 12, 2024, the Court held a telephone conference with the parties during which the Commissioner proposed that, in light of those stipulations, the case could be resolved without trial by means of a motion for summary judgment under Rule 121. We therefore issued an order striking the case from that trial calendar and setting a schedule for the filing and briefing of the Commissioner's motion for summary judgment. Dr. Baturin believed a trial to be necessary in this case; but in that order and two successive orders, we

---

[8] We issued on June 14, 2024, an order explaining to Dr. Baturin an opportunity to request assistance from pro bono attorneys. During a telephone conference with the parties on June 21, 2024, Dr. Baturin consented to our providing his contact information to two pro bono attorneys. In a conference call on November 12, 2024, Dr. Baturin stated that he had decided not to work with the pro bono attorneys.

**[\*8]** advised him that, in his opposition to the motion for summary judgment, he could explain why he believes a trial is necessary and that in his response to the Commissioner's motion Dr. Baturin could submit additional information in support of his case. He made such submissions as "Proposed Trial Exhibits," in addition to his response to the motion for summary judgment. For the reasons stated below, we conclude that his additional evidence does not raise any genuine dispute of material fact.

*Discussion*

## I. *Summary judgment*

The purpose of summary judgment is to expedite litigation and avoid unnecessary trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). The Court may grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 121(a)(2); *see Dahlstrom v. Commissioner*, 85 T.C. 812, 821 (1985). The moving party (here, the Commissioner) must demonstrate, through "pleadings, answers to interrogatories, depositions, admissions and any other acceptable materials," that there is no genuine dispute of material fact. *Fla. Peach Corp.*, 90 T.C. at 681.

While the burden to make that showing is on the moving party, the non-moving party "may not rest on the allegations or denials in that party's pleading" to oppose a motion for summary judgment. Rule 121(d); *see also Lipka v. Commissioner*, T.C. Memo. 2022-116, at \*6. Instead, "[t]he nonmovant must respond, setting forth *specific* facts and supporting those facts as required by Rule 121(c) [i.e., by "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"], to show that there is a genuine dispute of fact for trial." Rule 121(d) (emphasis added); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 324 (1986). For the reasons discussed below, we hold that the Commissioner's motion satisfies the standard for summary judgment and that Dr. Baturin's response fails to rebut it.

## II. *The U.S.-Russia Tax Treaty*

Generally, the Treaty permits the host country to tax "[i]ncome derived . . . from the performance of independent personal services" under Article 13 and "salaries, wages, and other similar remuneration

[*9] derived . . . in respect of an employment" under Article 14. U.S.-Russ. Tax Treaty arts. 13(1), 14(1).

The interpretation of treaty provisions must begin with the wording of the treaty. *N.W. Life Assurance Co. of Can. v. Commissioner*, 107 T.C. 363, 378–79 (1996). The role of the judiciary in interpreting treaty provisions is to give effect to their underlying intent or purpose. *Estate of Silver v. Commissioner*, 120 T.C. 430, 434 (2003).

A.    *Article 14*

Article 14(1) of the Treaty provides:

> Subject to [provisions not relevant here] . . . , salaries, wages, and other similar remuneration derived by a resident of a Contracting State [here, Russia] in respect of an employment shall be taxable only in that State [i.e., in Russia] unless the employment is exercised in the other Contracting State [i.e., in the United States]. If the employment is so exercised [i.e., in the United States], such remuneration as is derived therefrom may be taxed in that other State [in the United States].

That is, under the general rule of Article 14 of the Treaty, Dr. Baturin, though a resident of Russia, may be taxed in the United States on his remuneration for his employment exercised in the United States, unless an exception exists.

B.    *Article 18*

The pertinent part of section 1 of Article 18 ("Students, Trainees and Researchers") of the Treaty provides as follows:

> 1. An individual [Dr. Baturin] who is a resident of a Contracting State [Russia] at the beginning of his visit to the other Contracting State [the United States] and who is temporarily[9] present in that other State [the United States] for the primary purpose of:

---

[9] The Commissioner makes no contention that Dr. Baturin's presence in the United States failed to be "temporar[y]" in 2010 and 2011, so we do not address that requirement.

**[\*10]**    a) studying at a university or other accredited educational institution in that other State, or

    b) securing training required to qualify him to practice a profession or professional specialty, or

    c) studying or doing research as a recipient of a grant, allowance, or other similar payments from a governmental, religious, charitable, scientific, literary, or educational organization,

shall be exempt from tax by that other State [the United States] . . . with respect to the grant, allowance, or other similar payments.

Dr. Baturin contends that his work is described in subsection (c). His payments were indeed received "from a governmental . . . [or] scientific . . . organization," but the parties dispute whether those payments are correctly characterized as "a grant, allowance, or other similar payment[]."

III. *Dr. Baturin's contentions*

As we explain below in Part IV, the Fourth Circuit has held that "to resolve the case at hand, we must consider the United States-Russia Tax Treaty." *Baturin II*, 31 F.4th at 172. Dr. Baturin, however, has ignored this holding and has made extraneous contentions that we discuss here.

 A. *Nonresident status does not provide exemption.*

As we noted above (*supra* note 7), the parties stipulated that in the years at issue (2010 and 2011) Dr. Baturin was a nonresident alien in the United States on a J–1 visa. Dr. Baturin apparently believes that this fact resolves this case, as he asserts: "[T]he Petitioner was a nonresident alien in 2010-2011 and therefore was not subject to the same income tax obligations as U.S. citizens." If so, he is mistaken. As the Fourth Circuit explained: "Ordinarily, any income that a nonresident alien receives for personal services in the United States is

[*11] taxable in this country. *See* I.R.C. §§ 864(b)(1); 872(a)."[10] *Baturin II*, 31 F.4th at 172.

Consequently, in order to prevail, Dr. Baturin would have to show he is entitled to an exception from that general rule.

B.   *The withholding provisions do not provide exemption.*

Dr. Baturin argues "that, since he was temporarily in the United States under nonimmigrant 'J'-visa . . ., his compensation for 2010-2011 for employment (personal service) was *exempt from tax withholding*" (emphasis added), and to support this argument he cites authorities related to section 1441 ("Withholding of tax on nonresident aliens"). We hereafter refer to this as his "section 1441 argument." If this is indeed the argument he attempts, it fails for at least two reasons:

1.   *The remand rule*

First, this case is now on remand to this Court after our previous decision and the Fourth Circuit's reversal and remand. We take judicial notice of Dr. Baturin's briefs filed with the Fourth Circuit, and we conclude that he did not make before that court any section 1441 argument.[11] As the Fourth Circuit has held,[12] "a remand proceeding is

---

[10] Section 872(a)(2) provides that "gross income" subject to tax includes, in the case of a nonresident alien, "gross income which is effectively connected with the conduct of a trade or business within the United States"; and section 864(b) provides that the term "'trade or business within the United States' includes the performance of personal services within the United States." Section 864(b)(1) provides an exception when the nonresident alien has a "foreign employer," but Dr. Baturin "worked at Jefferson Lab, a Department of Energy facility in Newport News, Virginia," *Baturin II*, 31 F.4th at 171; and we see no hint in the record that either Jefferson Lab or its managing entity, JSA, was a foreign employer.

[11] On the contrary, in his informal response brief filed with the Fourth Circuit on October 12, 2021, Dr. Baturin stated correctly: "Tax 'withholding' differs from tax 'exemption.'" Indeed it does, and this statement actually contradicts his current apparent contention that the withholding provisions of section 1441 govern his liability. A version of this section 1441 argument appears in Dr. Baturin's two pretrial memoranda filed in this Court in 2015, though apparently not in his post-trial memorandum filed shortly thereafter. Even if we assume that he made (and did not abandon) this argument in the Tax Court, his failure to raise it on appeal, and the Fourth Circuit's silence on it, precludes his raising it now.

[12] The Commissioner's "Reply to Response to Motion for Summary Judgment" helpfully explains:

**[\*12]** not the occasion for raising new arguments or legal theories." *Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*, 510 F.3d 474, 481 (4th Cir. 2007).

### 2.     *Withholding vs. liability*

Second, the argument misses the mark because Dr. Baturin seems to look to rules that provide tax *withholding* requirements as if they were rules establishing tax *liability*.  But as Dr. Baturin himself stated in a brief to the Fourth Circuit, *see supra* note 11, "Tax 'withholding' differs from tax 'exemption.'"

Section 1441 imposes, on certain payers of certain amounts to nonresident aliens, an obligation to "deduct and withhold" tax from the payment, with a 30% rate and a 14% rate applicable to different payments, and it provides that the *payer* may be exempted from the *withholding* obligation in certain circumstances.[13]   However, the express terms of section 1441 do not provide to a *payee* any exemption from tax *liability*.  Dr. Baturin's argument that section 1441 does provide an additional exemption would contradict the Fourth Circuit's holding (that "income that a nonresident alien receives for personal

---

The mandate rule, an application of the law of the case doctrine, prohibits (i) litigating an issue that was already decided at the appellate level and not specifically remanded and (ii) litigating issues that could have been raised at the appellate level, but that were not raised at the appellate level. *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007); *see also Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*, 510 F.3d 474, 481 (4th Cir. 2007).  It also precludes considering issues on remand that were not initially raised in district court. *Volvo Trademark*, 510 F.3d at 481.  Put simply, "a remand proceeding is not the occasion for raising new arguments or legal theories." *Id.*

[13] Dr. Baturin asserts that "§ 1441 . . . requires exemption for the period of J-visa status"; but he does not cite or quote the subsection he relies on.  The provision in section 1441 that seems nearest to Dr. Baturin's contention is the provision in the second sentence of section 1441(b), which may reduce to 14% (but not to zero) the payer's withholding obligation on payments to a nonresident J–1 visa holder, but those payments must be "incident to a qualified scholarship to which section 117(a) applies," § 1441(b)(1), or "granted . . . as a scholarship or fellowship," § 1441(b)(2)—provisions that would bring us back to the Fourth Circuit's section 117(a)-influenced analysis (which Dr. Baturin dismisses) discussed below in part IV.B.  Dr. Baturin quotes a reference to section 1441(c)(4), which empowers the Secretary to exempt by regulation certain payments from the withholding obligation, but he does not cite any regulation applicable to the payments he received.  But again, even if a payer is relieved by section 1441 from a *withholding* obligation, the recipient's tax liability is not, without more, governed thereby.

[*13] services in the United States is taxable in this country," *Baturin II*, 31 F.4th at 172), so we do not consider it further.

IV.    *Article 18 of the Treaty*

To repeat, the Fourth Circuit has held that "to resolve the case at hand, we must consider the United States-Russia Tax Treaty." *Baturin II*, 31 F.4th at 172.

A.    *The text of Article 18, Section 1*

In particular, this case turns on section 1 of Article 18 ("Students, Trainees and Researchers"), quoted above in Part II.B, which provides exception from United States tax for an individual whose activity is "studying or doing research as a recipient of a *grant, allowance, or other similar payments* from a governmental, religious, charitable, scientific, literary, or educational organization." (Emphasis added.) The sole dispute in this case is whether Dr. Baturin's compensation from Jefferson Lab is properly characterized as a "grant, allowance, or other similar payment[]."

B.    *Quid pro quo*

The Fourth's Circuit's opinion "look[ed] to I.R.C. § 117[14] and its implementing regulations to inform whether payments are tax-exempt 'grant[s], allowance[s], or other similar payments' under Article 18 of the United States-Russia Tax Treaty." *Baturin II*, 31 F.4th at 175. Under that section 117 analysis, the ultimate distinction is between payments for "work done as part of a 'substantial quid pro quo,' which is taxable as compensation, and 'relatively disinterested, "no-strings" educational grants,' which are tax-exempt." *Baturin II*, 31 F.4th at 175. These same principles, it held, should govern the construction of "grant[s], allowance[s], or other similar payments" under Article 18. *See also Kramarenko v. Commissioner*, T.C. Memo. 2025-61, at *13–15.

The Fourth Circuit's opinion concluded by instructing that on remand the Tax Court "should determine what Jefferson Lab gained from having Dr. Baturin on staff" and whether there was "a 'substantial quid pro quo' here," *Baturin II*, 31 F.4th at 177–78; and for that process

---

[14] Dr. Baturin continues to dispute the applicability of section 117 ("Qualified Scholarships") to a nonresident alien, but the Fourth Circuit explained in some detail, *see Baturin II*, 31 F.4th at 174–76, why the construction of Article 18 of the U.S.-Russia Tax Treaty is properly informed by section 117 and the authorities construing it.

**[\*14]** the opinion propounded a list of questions (quoted above at pp. 6–7 and set out and discussed below).[15]

C.    *Analysis*

The undisputed material facts in the instant case establish that Jefferson Lab's bi-weekly payments to Dr. Baturin were not disinterested, no-strings grants, but rather were a quid pro quo for his work on the 12 GeV Upgrade Project at Jefferson Lab. We agree with the Commissioner's contention that the *Baturin* factors favor the classification of Dr. Baturin's payments from Jefferson Lab during 2010 and 2011 not as grants but rather as compensation for his services to Jefferson Lab where he worked.

1.    *If not Dr. Baturin, would Jefferson Lab have brought in someone else to work in their lab?*

With Dr. Burkert's declaration, the Commissioner showed (and Dr. Baturin did not dispute) that if Dr. Baturin had (through KNU) filled the staff scientist position in 2006, or if he had not been hired directly by the Lab in 2010 and 2011, then Jefferson Lab would have hired another qualified individual instead of Dr. Baturin for the staff scientist position to do the work that Dr. Baturin performed on the 12 GeV Upgrade Project.

2.    *Did the projects Dr. Baturin worked on pre- and/or post-date his tenure at Jefferson Lab?*

The 12 GeV Upgrade Project, including the CTOF detector project, did pre-date Dr. Baturin's hiring in 2007 and did continue with its work past 2015, when Dr. Baturin left the employment of Jefferson Lab. As of December 3, 2024, the CTOF detector was still in operation as part of the 12 GeV Upgrade Project. In response to the pre- and post-dating question raised by the Fourth Circuit, these facts indicate that Dr. Baturin was not retained to initiate his own research but instead was hired to do a component of an ongoing project that did not depend

---

[15] We called the Fourth Circuit's questions to the parties' attention in our orders of August 8, 2022, and May 17, 2024. The latter order explained that "[i]n deciding this case, we expect to try to answer the [listed] questions" and that "the parties should now be able to stipulate additional facts, perhaps including the answers to some or all of the Fourth Circuit's questions." The parties acknowledged these questions in their memoranda, but Dr. Baturin, though he criticized the Commissioner's treatment of those questions, did not, as far as we can tell, answer them explicitly in his memorandum.

**[*15]** on him for its origination or for its continuation after his departure.

Dr. Baturin resists this conclusion by pointing to the previous research that he had performed that related to Jefferson Lab's 12 GeV Upgrade Project. He asserts that he

> started to work on the Upgrade Program in Sep. 2003, i.e. 5 years before the Department Of Energy acceptance of the 12 GeV upgrade program and 6 years before beginning of construction period in 2009. Thus, the Project did not predate Petitioner's hiring by Jlab in 2007,[16] and did not predate his participation in the R&D part of the 12 GeV project (2004).

Assuming his assertions about his 2004 work to be correct, they do not make the necessary point. Rather, KNU's documents show that Jefferson Lab's project was ongoing "since 1996." Dr. Baturin, by his papers from KNU, showed both facility and experience with the Upgrade Project, which made him a good candidate for the Lab. But this fact only serves to demonstrate that his experience through KNU showed him to be a qualified person to hire for this Upgrade Project work. There is no suggestion that the Lab would not have done the Upgrade Project work but for Dr. Baturin. Before Dr. Baturin was employed at Jefferson Lab in 2007 *and* before he worked there under KNU auspices in 2004, the Upgrade Project was ongoing, and it remains true that the project did not depend on Dr. Baturin.

### 3. *Did Jefferson Lab retain the rights to the product of Dr. Baturin's research?*

On May 16, 2007, as a condition of employment with Jefferson Lab, Dr. Baturin signed an intellectual property agreement whereby Jefferson Lab retained all the rights to the products of Dr. Baturin's work. Thus, Jefferson Lab, rather than Dr. Baturin, retained the rights to the product of Dr. Baturin's work.

---

[16] It is a stipulated fact (which Dr. Baturin himself asserts) that the Upgrade Project did begin before (i.e., did "predate") 2007, the year his employment at Jefferson Lab began. We infer, however, that his point is that his earlier involvement (he inconsistently asserts both "2003" and "2004," but the evidence appears to support 2004) shows that the research should be seen as his own.

**[*16]**          4.          *How much discretion did Dr. Baturin have to direct the day-to-day performance of his work?*

The parties stipulated that Dr. Baturin had a supervisor (Dr. Burkert) and a project manager (Dr. Eloaudrhiri) who both provided "supervision" and "guidance" to Dr. Baturin in the performance of his work. During each of the years he worked at Jefferson Lab (including 2010 and 2011), Dr. Burkert evaluated and rated Dr. Baturin's work and prepared his annual performance appraisals. Dr. Baturin's employment was contingent upon his satisfactory performance on the job as documented by these performance appraisals.

Dr. Baturin presented no evidence and made no argument to explain away the fair import of the stipulated facts—i.e., that he was obliged to comply with the supervision and guidance he received from his supervisor and manager and that he did not have discretion to chart his own course. The closest he came to attempting to raise a genuine dispute was to assert in his memorandum that "[t]his *may be* a subject to the genuine dispute and may require interrogation of Jlab supervisor." (Emphasis added.) However, what Rule 121(d) requires of the non-movant is not mere "allegations or denials" but rather "setting forth specific facts and supporting those facts" with evidence (which could include his own declaration). Simply to argue that there "may be" a genuine dispute is not at all the same thing as to make a showing that there actually is a genuine dispute. Dr. Baturin made no such showing.

          5.          *Was there a substantial quid pro quo?*

After stating the foregoing four questions, the Fourth Circuit's opinion states "[i]n short," and then gives the "quid pro quo" principle (derived from *Johnson*, 394 U.S. at 751), in what we present here as a fifth factor, though it apparently expresses a summary of the *Baturin* factors.

Jefferson Lab's bi-weekly payments to Dr. Baturin were not to aid him in the pursuit of his study or research, nor were they disinterested, no-strings grants, but rather they were a quid pro quo in exchange for his assigned work on the 12 GeV Upgrade Project at Jefferson Lab. In exchange for the salary it paid him, Jefferson Lab extracted a substantial benefit from Dr. Baturin in the form of the personal services he rendered.

Dr. Baturin's employment was "governed by the policies set forth in the Jefferson Lab Administrative Manual" and was contingent upon

**[\*17]** his satisfactory performance on the job. Dr. Baturin's work was evaluated during each of the years he worked at Jefferson Lab (including 2010 and 2011). His performance evidently satisfied them, because they retained him. His employment was "contingent," so they could have fired him if he had failed to perform satisfactorily. Plainly, his compensation was paid in return for his work, and he performed his work to earn his compensation.

Before posing "In short" the quid pro quo question, *Baturin II* inserts a citation: "*Cf.* Rev. Rul. 80-36, 1980 WL 129605 [1980-1 C.B. 366, 366–67], \*1 (outlining relevant considerations to determine whether researchers' income was tax-exempt under U.S.-Japan Income Tax Convention)." *Baturin II*, 31 F.4th at 178. Revenue Ruling 80-36, 1980-1 C.B. at 368, states the general principle that tax exemption "does not extend to professional researchers receiving compensation for performing research services," a generality that includes Dr. Baturin. The Revenue Ruling explains that a researcher may be exempt from tax where he is paid for effort "in the pursuit of a specific research goal," where his "work is not subject to direction or supervision by any other person, and [he] is entitled, but not required to publish the results of the research," and where "[n]o other person has any right to the product of [his] research," *id.*, but none of that describes Dr. Baturin. Rather, in the words of the Revenue Ruling, we hold that Dr. Baturin was "performing valuable research services under the supervision of the grantor [i.e., Jefferson Lab] that are primarily for the benefit of the grantor of the payments," a circumstance in which the payments are subject to tax. *See id.*

*Conclusion*

We looked for Dr. Baturin to show facts that would support his position under the analysis called for by *Baturin II*, but he did not. Rather, Jefferson Lab extracted a substantial benefit from Dr. Baturin's full-time skilled labor working on specific research projects as a condition of his receiving ordinary compensation in the form of a salary and various other benefits incidental to employment. In other words, Jefferson Lab required a substantial quid pro quo from Dr. Baturin in the form of his services. His compensation is therefore not exempt from taxation under the Code nor under Article 18 of the U.S.-Russia Tax Treaty.

**[\*18]** Finding no genuine dispute of material fact, we will grant the Commissioner's motion for summary judgment.

To reflect the foregoing,

*An appropriate order and decision will be entered.*